JUAN ROSARIO MERCADO, Petitioner, *v.* INDUSTRIAL COMMIS-
SION OF PUERTO RICO, ETC., and SECRETARY OF LABOR OF
PUERTO RICO, ETC., Respondents.

No. 574. Decided May 4, 1962.

*Francisco Colón Gordiany* and *María Valentín Collazo* for petitioner. *Arturo Estrella, Acting Solicitor General,* and *Genoveva R. Carrera, Assistant Solicitor General,* for Secretary of Labor of Puerto Rico.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Santana Becerra and Mr. Justice Rigau.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

On February 11, 1944 a driver's license bearing No. 88421 was issued to petitioner Juan Rosario Mercado, to drive heavy motor vehicles. He was employed by the Government of the Capital as chauffeur in the service of public sanitation from 1945 to June 21, 1958, date in which he became physically disabled to continue the aforesaid work.

The aforesaid employee duly paid his assessments to the Chauffeurs' Social Security Fund established by Act No. 428 of May 15, 1950 (29 L.P.R.A. §§ 681–694), by payments made by himself and by his employer until the date in which he terminated his employment for disability.

Because of his failure to renew his license, it was cancelled by the Secretary of Public Works on September 30, 1954.

On August 12, 1958 petitioner requested the Bureau of Social Security for Chauffeurs of the Department of Labor for the benefits of a pension for physical disability by virtue of § 5(A) of Act No. 428 of May 15, 1950, as amended by Acts Nos. 59 of June 11, 1954 and 59 of June 14, 1957. (29 L.P.R.A. § 686.) The same request was made on August 13 of the same year by his employer, the Government of the Capital.

The afore-mentioned Social Security Bureau for Chauffeurs denied both requests. Later the Secretary of Labor rendered a decision upholding the Bureau. The Commissioner stated:

"There is no controversy as to whether appellant paid his assessments for the two years immediately preceding the filing of the benefit request. The only issue involved in the case at bar is whether a person who has contributed to the Chauffeurs' Social Security Fund for the weeks provided by law, has a right to the compensation fixed therein, despite the fact that he did not renew his driver's license and is driving a motor vehicle during the whole period of assessment in violation of the Traffic Act.

"Section 1 of Act No. 428 of May 15, 1950, as amended, defines what a chauffeur is, specifying that it is 'any natural person authorized under the law to drive motor vehicles, etc. . . . ' Appellant does not qualify as *chauffeur*, pursuant to this definition, since he was not authorized to drive motor vehicles, because he allowed his license to expire. This, ipso facto, excludes him from the benefits of Act No. 428. . . ." (Solicitor General's brief, p. 2.)

The petitioner appealed to the Industrial Commission and the latter affirmed the decision of the Secretary of Labor accepting the legal basis set forth by the aforesaid official in his decision. We granted a writ to review the Commission's decision.

Act No. 428 of May 15, 1950, established "for the chauffeurs of Puerto Rico a social security plan which covers the risks of sickness, total and permanent physical disability, and death." The first section of this Act defines the term *chauffeur* as follows:

"Any natural person authorized under the law to drive motor vehicles who for pay, salary, wage, fee, or any other form of compensation, whether obtained on a percentage basis, a combination of wage and percentage, or a combination of wage and other considerations or services is engaged in the transportation of persons, animals, or things and who operates

said vehicles or his own vehicle as his main occupation or means of livelihood." (29 L.P.R.A. § 681.)

 Thus, to avail himself of this plan of social security, the person must fulfill the following requirements: (1) that he be authorized pursuant to the law to drive motor vehicles; (2) that he drive motor vehicles engaged in the transportation of persons, animals, or things; (3) that for his services he obtain pay, salary, wage, fee, or any other form of compensation, and (4) that he operate the aforesaid vehicles or his own vehicle as his main occupation or means of livelihood. The Act, thus established the plan for the benefit of persons who being authorized by law to drive motor vehicles, have as their main occupation or means of livelihood, the operation of motor vehicles for pay or compensation, whether these vehicles were their own or someone else's. The evident purpose of the statute is to protect the chauffeur who has made the operation of motor vehicles his main occupation or means of livelihood. It is difficult to conceive that this protection be extended to persons who drive motor vehicles in violation of the law for not being authorized to do so.

Petitioner was not authorized to drive motor vehicles, at least since 1949. Let us see. Act No. 279 of April 5, 1946 provided in paragraph "(o)" of § 7 that licenses issued before the approval of that Act should be renewed two years after April 5, 1946 and within the following 60 days. Once this term of 2 years 60 days expired, the chauffeur who had not renewed his license would be bound upon renewing it, to pay the fees established by law for the issuance of a new license. Petitioner did not renew his license within the aforesaid term, nor subsequently.

Act No. 16 of June 5, 1948 amended paragraph (o) of § 7 of Act No. 279 of 1946. It provided that on and after January 2, 1949 "any license to drive motor vehicles in Puerto Rico shall be renewed in the order hereinafter set forth, upon

payment of the fees prescribed by law, being understood that *the terms of validity of same shall be two years."* (Italics ours.)

Pursuant to the order established for renewing the licenses issued before April 11, 1946, that of petitioner should have been renewed during the month of September 1949. He did not do so. The aforesaid Act provided besides that: "Renewals shall close on the last day of the month specified. *After said date licenses* for which no application or effort for renewal has been made, *shall be considered suspended."* (Italics ours.) A term of grace of five years was granted to renew the licenses without the requirement of a new examination in a provision which reads as follows: *"Provided,* That a term of grace of five years is hereby granted during which, and upon the payment of the fees prescribed by law, *licenses may be obtained* without requirement of new examination." Petitioner was thus given until 1953 to *obtain license* without the requirement of new examination and again he failed to do so.

Act No. 217 of May 9, 1952 amended again the above-mentioned paragraph (o) of § 7 of Act No. 279 of 1946. The amendment provided that on and after July 1, 1952 any license issued to drive motor vehicles in Puerto Rico shall be valid for four years, but after the expiration of the fourth year it shall be renewed within 90 days upon payment of the fees prescribed by law, by means of application for the purpose accompanied by a medical certificate showing that the applicant is physically and mentally able to drive motor vehicles. A term of grace of five years was granted again to renew the license without the requirement of a new examination. As to the licenses which expired after July 1, 1951, but before June 30, 1954, they were automatically extended for an additional term of two years. As to the licenses not renewed and whose date of expiration was before July 1, 1951, they could be renewed under the same conditions in which the

licenses issued on and after July 1, 1952 were renewed. Under this Act petitioner was being granted five more years to renew his license without the requisite of a new examination provided he paid the corresponding fees and attached to his application the medical certificate proving his mental and physical capacity to drive motor vehicles, but again he failed to do so. This Act also provided that any license not renewed within the term specified by the Act would be considered suspended.

 Thus, from at least 1949 until 1958, date of his disability, petitioner's license was suspended. A suspended license did not authorize him to drive motor vehicles. An interpretation to the contrary would amount to ascribing to the lawmaker the approval of empty, useless and meaningless provisions. But the context of the laws which we are examining do not permit attributing the legislator with the making of senseless laws. For example, Act No. 16 of 1948 upon providing the order for the renewal of licenses stated that the term of validity of those licenses was for two years. That is, the licenses timely renewed were valid for two years. Could licenses not renewed have any validity? Certainly not. On the contrary, what the aforesaid Act provided was that the licenses not renewed would be suspended. That is, the permission implied by the issuance of a license was suspended, and therefore the owner of that suspended license was not authorized by law to drive motor vehicles in the meantime. When that Act grants the term of grace of 5 years in the "provided" clause which we have copied above, it states that this term is to *be able to obtain license* without the requirement of a new examination. If the suspended license actually authorized him to drive motor vehicles, why does the legislator state "to be able to obtain license"? He says so because a suspended license, for the purposes of the authorization which said license entails, is equivalent to not having a license.

■ Act No. 217 of 1952 gave validity for four years to licenses issued on and after July 1, 1952. If not renewed within those 90 days after the fourth year had expired, the license lacked validity. That is precisely the nature of a suspended license, it lacks validity. This necessarily implies that the holder of a suspended license, which is a license without validity, is not authorized to drive motor vehicles and for this to be so, it was unnecessary for the Secretary of Public Works, in the event that he had the authority to do so, to cancel the suspended license. The licenses whose date of expiration was before July 1, 1951 were in the same situation. Petitioner's license had expired since the term granted for its renewal by Act No. 279 of 1946 ended.

■ It is true that neither his employer nor any other authority called petitioner's attention to the legal provisions discussed herein, but this fact does not excuse the noncompliance with the law.

■ It may happen, as in the case at bar, that a person contributes to the Fund because he is employed in the operation of motor vehicles for pay, without being a chauffeur, as defined by the law, that is, without being authorized by law to drive motor vehicles. Even if he pays the corresponding assessments, that person, because he is not *a chauffeur*, as the aforesaid term is defined by the law, could not avail himself of the benefits of the plan. The payments made by petitioner herein constitute an irregularity. They were not payments authorized by law.

Upon the amendment of Act No. 428 of 1950 by Act No. 59 of June 14, 1957, it was provided in § 9, paragraph (c) (Plan Administration Provisions) that the Secretary of Labor "may refuse the benefits granted by this act to any chauffeur or his beneficiaries whenever he shall find upon investigation that the credited assessments that would entitle him to such benefits were not paid in accordance with the provisions governing the procedure for their payment,

or that payment of the assessment was made after the chauffeur's knowing that he was not in sound health. In such cases the assessment so paid shall be refunded."

The Labor Committee of the Senate, upon proposing the approval of the amendment to § 9 which we mentioned, stated thus: "The amendments to paragraphs (a), (b) and (c) of § 9 are rather of an explanatory character. It is conclusively established that *no assessments shall be paid in violation of the provisions of the law*, so as to avoid especially that a chauffeur who knows he is ill contribute to the Fund in order to have the right to benefit payments. It is provided that when this occurs, the chauffeur shall be refunded the assessments which he might have paid." III-IX Journal of Proceedings of the Legislative Assembly of Puerto Rico 1147. (Italics ours.)

■ It may be inferred from the foregoing that the assessments made to the Fund by a chauffeur who is not authorized to drive motor vehicles, are payments in violation of the law, which permits such payments only to the plan's beneficiaries, that is, to the chauffeurs, as defined in § 1 of Act No. 428 of 1950.

Petitioner in this case meets all the requirements provided by law in order to have a right to the benefits of the plan, except that of being a *chauffeur* such as this term is defined in the law. Not being a *chauffeur*, prevented him from legally contributing to the Fund for the Social Security of Chauffeurs. The assessments which were credited to him were not authorized by law. He was not qualified to contribute nor could he avail himself of the benefits of the plan created by Act No. 428 of 1950. Therefore, his right is limited to receiving the reimbursement of these assessments.

The decision rendered by the Industrial Commission on July 22, 1959 is affirmed.

Mr. Justice Santana Becerra, dissenting.

I dissent in the case at bar because I understand that the Secretary of Labor upon denying petitioner the benefits to which he is entitled under the Social Security for Chauffeurs Act, and the Industrial Commission upon affirming the aforesaid denial, acted under powers and attributes not granted to them by the Act for such cases. A history of the entire matter, to begin at its beginning, is the following:

Petitioner was issued a license in 1944. The obligation to renew the licenses to drive motor vehicles was provided by paragraph "(o)" of § 7 of the Automobile and Traffic Act, Act No. 279 of April 5, 1946. The licenses issued before the aforesaid Act No. 279 would be renewed two years after April 5, 1946 and within the next 60 days. Once this term of 2 years 60 days had expired, the chauffeur who had not renewed would be bound upon renewing to pay the fees for a new license. No sanction was provided as to suspension or cancellation of the license, or prohibition to drive. Under paragraph (a) of § 7 itself only that person to whom no license had been *issued* was forbidden to drive.

On June 5, 1948, at the expiration of the aforesaid term of two years 60 days, Act No. 16, which amended paragraph "(o)" went into effect, providing dates on which licenses issued prior to Act No. 279 would be renewed. Petitioner's license, because of its number, had to be renewed during September 1949. It was then provided that the license would be *suspended* but the provisions of paragraph (a) were not altered. Furthermore, a term of grace of 5 years was granted, so that through the payment of the fees prescribed by law, licenses could be renewed without the requisite of a new examination.

On May 9, 1952, Act No. 217, which amended again paragraph "(o)" went into effect, providing that on and after July 1, 1952 any license would be valid for four years and it had to be renewed within 90 days counting from the

date of expiration, upon payment of the fees prescribed by law, accompanied by a medical certificate showing that the applicant is physically and mentally able to drive motor vehicles. After the 90 days had expired, the license nevertheless could be renewed within a period of 5 years upon payment of the fees prescribed by law, as in the case of an original application, without the requirement of a new examination. It was further provided in this Act *that every license not renewed whose date of expiration was before July 1, 1951, could be renewed under the same conditions stated above,* and the provision that a license not renewed would be considered suspended, was maintained in force. Neither was paragraph (a) of § 7 altered on this occasion. By Act No. 50 of June 8, 1954, paragraph (a) was amended to include various specific penalties, but its original text remained the same, that is, that the operation of motor vehicles was still forbidden to those persons to whom no license had been *issued.*

At least until Act No. 217 of 1952, in which it was required that a medical certificate be included upon renewing the licenses, the renewal apparently had no other purpose but that of procuring funds and it had no relation whatsoever with the aptitude or condition of a person to drive. Pursuant to Act No. 279 the money collected by the renewal of licenses would go to a special fund for the study, construction, etc., of roads. By Act No. 227 of May 15, 1948 it was provided that 50 per cent of the sum paid for the renewal of the license provided in paragraph "(o)" of § 7 would be deposited in a special fund which was thereafter named "Fund for the Social Security of Public Chauffeurs of Puerto Rico," in order to be devoted to the ends and purposes to be provided by law. When this occurred, the Act creating the Social Security for Chauffeurs had not yet been approved. The same situation was sustained by Act No. 116 of April 26, 1949, but Act No. 33 of March 20, 1951 provided that the

fees paid for renewal of licenses be deposited in the general funds of the Treasury, that is, it was taken away from the Chauffeurs' Social Security Fund in spite of the fact that now, a fund created by law did exist. It could not be said, therefore, that a chauffeur who did not renew his license was in some way impairing or prejudicing his own security fund.

I have made the previous history of the legislation in order to place in the proper perspective the actions of the Secretary of Labor and of the respondent Commission. We know of the serious concern of our Legislative Assembly respecting problems of traffic and operation of motor vehicles. But when on May 15, 1950 and by Act No. 428 it created the Social Security for Chauffeurs, it provided funds with the contributions of the chauffeurs and employers and established an entire system, the concern of the Legislative Assembly was, indeed, of another nature. At this moment it was not concerned with traffic problems but with the social problems it meant to remedy with this legislation. That is why I understand that it was not within the particular province and concern of the Secretary of Labor, as administrator of this system, nor of the Industrial Commission upon reviewing it, to deny the insurance to petitioner, who under that legislation had met all the requirements entitling him to receive it, because of the fact that this chauffeur had committed a violation of the Automobile Act, which pursuant to that same Act did not operate to preclude petitioner from being a chauffeur to whom authorization had been given to drive motor vehicles. See paragraph (a) of § 7 of Act No. 279, as amended. Upon the creation on May 15, 1950 of this social security system, petitioner's situation at law was that of a person authorized to drive motor vehicles, whose license was suspended but not cancelled nor annulled. Furthermore, any breach on his part for having failed to renew in September 1949 was overcome by the legislator himself in establishing the provision of Act No. 217 copied above.

This is the situation as set forth in the decision by the Secretary of Labor. On August 13, 1958 petitioner requested the benefits of the chauffeurs' insurance for total and permanent physical disability. Since July 9, 1958 he was unable to drive motor vehicles according to medical certificate, by reason of cardiopathy due to arteriosclerosis with cardiac insufficiency and general arteriosclerosis. There was no controversy as to the workman's disability nor as to the fact that he paid his assessments for the time specified by the law, the Secretary stating thereby that the only issue involved was whether a person who had paid his assessments to the Fund during the reglamentary weeks had a right to the compensation of that law despite his not having renewed the chauffeur's license and his driving a motor vehicle in violation of the Traffic Act. He decided to deny him compensation because his license had been *cancelled* on September 30, 1954, upon his failure to renew it—as to the nonexistence of this cancellation I shall refer later—and he did not qualify as chauffeur because he had been driving without authorization and this "ipso facto" excluded him from the benefits of Act No. 428.

There is evidence in the record of the respondent Commission that the Government of the Capital paid assessments to the Fund as employer in respect to this employee from September 23, 1950 until August 28, 1954 and from September 4, 1954 until September 26, 1958, with the exception of several weeks. Petitioner paid assessments since December 1950. The Social Security Bureau granted petitioner benefits for illness during some periods in 1953, 1954, 1955, 1957, and from May 27 to May 30, and from July 16 to August 8, 1958.

Attached to the record there is a certificate from the Department of Public Works dated June 22, 1959, recording therein that petitioner is not authorized to drive, but pos-

sessed heavy vehicles driver's license No. 88421 issued on February 11, 1944, and that "this license *became* cancelled in September 1954, because it was not renewed." Before continuing I want to set forth that this document does not certify *a fact*—petitioner's license was not cancelled—but a legal conclusion that it *became* cancelled, of course erroneous, of the official who issued it and which has no other effect in the evidence than that of a mere interpretative opinion. The aforesaid conclusion was erroneous and was not authorized by law primarily, because Act No. 279 of 1946, as amended, did not grant the Department of Public Works the power to cancel licenses *administratively*, since this power resided only in the courts—§ 18.

Secondly, because pursuant to the legal provisions copied above, the license which was not renewed had by law the condition of being suspended. If it was renewed after 90 days before the period of five years had elapsed, fees had to be paid as if it were an original license. After the period of five years, the examination had to be taken in addition. Those were the civil sanctions of the Act for failure to renew. The Secretary of Public Works was only authorized under paragraph "(o)" of § 7 *to deny* the renewal of a license when in his opinion the holder constituted a *menace to public safety;* and paragraph (p) provided that every license *obtained* by an applicant through *false information* would be considered *void* from the date of issuance. No provision of the Act granted power to the Secretary of Public Works to definitively cancel a license because it had not been renewed and much less behind the interested person's back without his being notified or heard, as it appears from the record. In his statement before the Commission, petitioner, who appears to be a person of limited mental capacity, stated that in all the time he worked with the Government of the Capital since 1945 as chauffeur of the garbage trucks,

he was never informed by any person or entity whatsoever of anything related with the renewal of his license.[1]

The respondent Commission based its judgment on the legal premise: (1) that § 1 of Act No. 428 of 1950 creating the security system defines "chauffeur" as a natural person authorized according to the law to drive motor vehicles, engaged in the transportation of persons, etc., and who operates said vehicles as his main occupation and means of livelihood; (2) that upon the cancellation of petitioner's license (cancellation which was nonexistent in fact as well as in law) petitioner was violating the Automobile Act by driving in the course of his employment and this fact was "*sufficient to exclude him*" from the benefits; (3) that upon paying his fees he was acting without juridical consequences and the fact that he paid such fees did not place him within the frame of the system.

These legal premises on which the action taken is based are very fragile. Section 1 of Act No. 428 had no other purpose but to establish which workman would belong to this system, the chauffeur in contradiction from the plumber, from the carpenter, etc., and any chauffeur who drove vehicles as his *main occupation* or means of livelihood. This latter provision was the essential thing for the purposes of this legislation. Whoever was authorized was understood to be such, and although the Act had not expressed it, it would have to be thus assumed. Once petitioner came to be a part of the system, having duly qualified, the Secretary of Labor

---

[1] Under Act No. 95 of June 29, 1954 and as part of all the established proceedings related with driving in the state of intoxication, the Secretary of Public Works was authorized upon receiving statements from a judge, to suspend first, and after a hearing to cancel licenses of persons charged with driving in a state of intoxication whenever he concluded that there was no justification for refusing to submit to the laboratory tests provided by law. The cancellation would be provisional except in case of recurrence. This law has no application whatsoever in the case at bar.

was only authorized to deny his rights or benefits within the system for the reasons which Act No. 428 establishes and none others.

As I stated in my opinion in *Alers* v. *Superior Court*, 83 P.R.R. 683, and I now repeat with much more reason, this is a serious problem of administrative functioning which requires a somewhat careful analysis. Up to what point may an agency, to which the Legislative Assembly has entrusted the task of administering a legislation, which conveys specific ends and purposes, especially this social legislation for remedial purposes, refuse, within its judicial or quasi-judicial function, *in the absence of a statutory provision*, the rights for reasons not set forth in that legislation on the basis of noncompliance with other statutes. As I stated in *Alers*, when the legislator has so desired that a legislation at the same time serve the purpose of making more effective the compliance with another one, he has so provided. I referred (footnote 1 of my opinion in that case) to some examples, being typical the illustration offered by § 11 of Act No. 130 of 1945 on Labor Relations. For example, Act No. 85 of June 14, 1960, in order to make more effective the observance by the employer of Act No. 428, which creates this insurance, provided that the cases where public transportation enterprises had been sentenced for noncompliance with the obligation to pay the assessment shall be reported to the Public Service Commission for their due consideration when such enterprises appear before it in proceedings related to their certificates of necessity and convenience.

If the lawmaker had wished to punish or sanction the chauffeurs for the noncompliance or violation of the provisions of the traffic laws by denying them their rights under the system, he would have so provided. He would have stated that no chauffeur who at the time of being entitled to a benefit was in violation of the traffic law or had his li-

cense suspended or temporarily or permanently annulled, could be granted such benefits. The evidence mentioned in § 5(A) (now 5) in cases of total and permanent disability has the purpose of informing the Secretary of Labor that the Department of Public Works has determined that petitioner is permanently disabled to drive, the authorization having been cancelled by reason of such total disability.

I am afraid that the Legislature did not provide such a thing because it would have destroyed the very purpose of the legislation. The nature thereof should not be lost from sight. The legislation was intended to create a social system of protection at a level in which obligations are imposed and rights accrue at a long perspective; it was not a legislation for a specific day, moment or situation. It could not be contemplated, for example, that within the hazards of the work of the chauffeur whose main occupation is driving and which expose him to incur in violations of the law, a member of the system should lose his benefits because at a specific moment in which the need to claim them arose, his license was suspended or he had driven without authorization, as would happen in the trivial case of the chauffeur who having been given a ticket drove after the day of the summons without having sought the return of the withheld license. There is no doubt that a violation of the traffic regulation would have been committed, but it would not be incumbent on the Secretary of Labor within Act No. 428 to pursue or punish him by denying him benefits. To have this petitioner punished was the responsibility of the police, and in another aspect of the case, also of his employer, the Government of the Capital, and even of the Manager of the Insurance himself in not providing these workers of limited instruction and knowledge with the adequate information in a matter so related with their means of daily support. This petitioner suffered a punishment for the violation of the traffic law way beyond

the one he would have suffered under the provisions of the Automobile Act itself.

The third premise to the effect that the payment of the fees by this workman did not have juridical consequences and thus paying his assessments, did not fall within the ambit of the system, is in my opinion a *"finesse"* which has no room in the spirit in which these administrative agencies should interpret and apply the remedial statutes enacted for humanitarian purposes, whose objective should be that said purposes be achieved and not defeated. Ironically, those assessments had juridical consequences for the purposes of retaining them in the Fund as legitimately deposited, and not returning them upon denying the benefits.

For the foregoing considerations I cannot sanction the administrative proceedings in this case and I would decide that the order of the Commission be reversed and that the petitioner workman be granted the benefits to which he was entitled under Act No. 428 of 1950.